Timothy W. Brown
THE BROWN LAW FIRM, P.C.
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Robert C. Moest, SBN 62166
LAW OFFICES OF ROBERT C. MOEST
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Fax: (310) 915-9897
Email: RMoest@aol.com

*Liaison Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELE OGLINA, DERIVATIVELY AND ON BEHALF OF AMPIO PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL MACALUSO, DAVID BAR-OR, PHILIP H. COELHO, RICHARD B. GILES, DAVID R. STEVENS, VAUGHAN L. CLIFT, MARK D. MCGREGOR, AND GREGORY A. GOULD, <br><br> Defendants, <br><br> And <br><br> AMPIO PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | CASE No.: <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: <br><br> (1) BREACH OF FIDUCIARY DUTY; <br> (2) CORPORATE WASTE; <br> (3) GROSS MISMANAGEMENT; AND <br> (4) UNJUST ENRICHMENT <br><br> **JURY TRIAL DEMANDED** |

# INTRODUCTION

Plaintiff Michele Oglina ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Ampio Pharmaceuticals, Inc. ("Ampio," or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Michael Macaluso, David Bar-Or, Philip H. Coelho, Richard B. Giles, David R. Stevens, Vaughan L. Clift, Mark D. McGregor, and Gregory A. Gould (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Ampio, gross mismanagement, abuse of control, and unjust enrichment for her complaint against Individual Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ampio, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

///

# NATURE OF THE ACTION

1.    This is a shareholder derivative action which seeks to remedy wrongdoing committed by Ampio's directors and officers.

2.    Ampio is a biopharmaceutical company that is focused primarily on the development of therapies to treat prevalent inflammatory conditions in the U.S. for which there are limited treatment options.  Ampio's two lead product candidates in development are Ampion for osteoarthritis of the knee and Optina for diabetic macular edema.

3.    On January 13, 2014, the Company issued a press release announcing that the 500 patient Phase III pivotal trial of Ampion (the "STEP Study") for the treatment for osteoarthritis of-the-knee ("OAK") has received Institutional Review Board ("IRB") approval and FDA IND clearance, and that patients enrollment and treatments have commenced.  An IND application must become effective before human clinical trials may begin in the U.S.

4.    The STEP Study lacked autonomy.

5.    The trial drug supply for the STEP Study was shipped to clinical sites at lower temperatures than permitted by the drug specifications.

6.    Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) the clinical research organization conducting the STEP Study lacked autonomy; (2) the trial

drug supply for the STEP Study was shipped to clinical sites at lower temperatures than permitted by the drug specifications; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.   Defendants failed to correct these materially false and misleading statements.

7.   Defendants breached their fiduciary duties by failing to ensure that the clinical research organization conducting the STEP Study was autonomous.

8.   Defendants breached their fiduciary duties by failing to ensure that the trial drug supply for the STEP Study was not shipped to clinical sites at lower temperatures than permitted by the drug specifications.

9.   Defendants breached their fiduciary duties by causing the Company to make false and misleading statements and/or omissions of material fact that:  (1) the clinical research organization conducting the STEP Study lacked autonomy; and (2) the trial drug supply for the STEP Study was shipped to clinical sites at lower temperatures than permitted by the drug specifications.  Defendants breached their fiduciary duties by causing the Company to fail to correct these false and misleading statements and/or omissions of material fact.

10.   In light of Defendants' conduct, which has subjected the Company and Defendants Macaluso, McGregor, and Gould to being named as defendants in two federal securities fraud class action lawsuits filed in this Court, a majority of the Board cannot consider a demand to commence litigation against themselves on

behalf of the Company with the requisite level of disinterestedness and independence.

11.    The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

### JURISDICTION AND VENUE

12.    Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

///

///

Verified Shareholder Derivative Complaint

## **PARTIES**

15.    Plaintiff is a current shareholder of Ampio.   Plaintiff has been a shareholder of Ampio common stock at all relevant times, and has continuously held Ampio common stock at all relevant times.  Plaintiff is a citizen of Italy.

16.    Defendant Ampio is a biopharmaceutical research and development company.    Ampio is a Delaware Corporation headquartered in Englewood, Colorado.  The Company's stock has been listed on the NYSE Market ("NYSE") under ticker "AMPE."

17.    Defendant Michael Macaluso ("Macaluso") has been the Company's Chief Executive Officer since January 9, 2012, and one of its Directors since March 2010.  According to the Company's Schedule 14A filed with the SEC on August 15, 2014 (the "2014 Proxy Statement"), Macaluso "founded Life Sciences and has been a member of the board of directors of Life Sciences, our predecessor, since its inception. Mr. Macaluso has also been a member of our Board of Directors since the merger with Chay Enterprises in March 2010 and our Chief Executive Officer since January 9, 2012. Mr. Macaluso was appointed president of Fibrocell Science, Inc., formerly known as Isolagen, Inc., and served in that position from June 2001 to August 2001, when he was appointed chief executive officer. In June 2003, Mr. Macaluso was re-appointed as president of Isolagen and served as both chief executive officer and president until September 2004. Mr. Macaluso also served on the board of directors of Isolagen from June 2001 until April 2005. From October

1998 until June 2001, Mr. Macaluso was the owner of Page International Communications, a manufacturing business. Mr. Macaluso was a founder and principal of International Printing and Publishing, a position Mr. Macaluso held from 1989 until 1997, when he sold that business to a private equity firm. Mr. Macaluso's experience in executive management and marketing within the pharmaceutical industry, monetizing company opportunities, and corporate finance led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure." Upon information and belief, Macaluso is a citizen of Colorado.

18.     Defendant David Bar-Or ("Bar-Or") has been the Company's Chief Scientific Officer since March 2010.  Bar-Or was the Company's Chairman of the Board from March 2010 until May 2010.  At all relevant times Bar-Or has been a Company Director.   According to the Company's 2014 Proxy Statement, "[f]rom April 2009 until March 2010, he served as chairman of the board and chief scientific officer of Life Sciences. Dr. Bar-Or is currently the director of Trauma Research at Swedish Medical Center, Englewood, Colorado, and St. Anthony's Hospital, Lakewood, Colorado. Dr. Bar-Or is the founder of Ampio Pharmaceuticals Inc. Dr. Bar-Or is principally responsible for all patented and proprietary technologies acquired by us from BioSciences in April 2009 and for all patents issued and applied for since then, having been issued over 270 patents and having filed or co-filed almost 120 patent applications as of the fiscal year 2013.

Dr. Bar-Or has authored or co-authored over 105 peer-reviewed journal articles and several book chapters. He is the recipient of the Gustav Levi Award from the Mount Sinai Hospital, New York, New York, the Kornfeld Award for an outstanding MD Thesis, the Outstanding Resident Research Award from the Denver General Hospital, and the Outstanding Clinician Award for the Denver General Medical Emergency Resident Program. Dr. Bar-Or received his medical degree from The Hebrew University, Hadassah Medical School, Jerusalem, Israel, following which he completed a biochemistry fellowship at Hadassah Hospital under Professor Alisa Gutman and undertook post-graduate work at Denver Health Medical Center, specializing in emergency medicine, a discipline in which he is board certified. He completed the first research fellowship in Emergency Medicine at Denver Health Medical Center under the direction of Prof Peter Rosen. Among other experience, qualifications, attributes and skills, Dr. Bar-Or's medical training, extensive involvement and inventions in researching and developing our product candidates, and leadership role in his hospital affiliations led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure." Upon information and belief, Bar-Or is a citizen of Colorado.

19.    Defendant Vaughan L. Clift ("Clift") has been the Company's Chief Regulatory Affairs Officer since March 2010. According to the Company's 2014 Proxy Statement, Clift "was employed by Life Sciences from May 2009 until

March 2010. From 2005 to 2009, Dr. Clift was the chief executive officer of Detectachem LLC, a Houston, Texas-based manufacturer of a hand-held explosive and narcotics detection device. Dr. Clift was the Vice President of Operations, including all FDA regulatory matters, for Isolagen from 2002 until 2005. From January 2001 to May 2002, Dr. Clift researched home oxygen therapy systems while developing an oxygen system for NASA. From July 1997 to January 2001, he was Chief Scientist of DBCD, Inc., a medical device company that manufactured a range of blood diagnostic products for the human and veterinary markets. From May 1992 to June 1997, Dr. Clift was Chief Scientist for the Science Payload Development, Engineering and Operations project at Lockheed Martin's Human Spaceflight Division. Dr. Clift has received a number of international and federal awards and was nominated as one of NASA's top ten inventors in 1995." Upon information and belief, Clift is a citizen of Colorado.

20.    Defendant Gregory Gould ("Gould") has been the Company's Chief Financial Officer since June 10, 2010.  According to the Company's 2014 Proxy Statement, "Mr. Gould was most recently a financial and operational consultant to the biotech industry through his company Gould, LLC, from April 2012 through June 2014. Prior to working as a consultant, Mr. Gould was the chief financial officer, secretary and treasurer of SeraCare Life Sciences, Inc., a biological products manufacturer and service provider for the diagnostic, therapeutic and drug discovery markets, from November 2006 through April 2012. During the period

from July 2011 until April 2012, he also served as the interim president and chief executive officer of SeraCare Life Sciences, Inc. From 2004 to 2005, Mr. Gould served as chief financial officer, treasurer and secretary of Atrix Laboratories, Inc., a specialty pharmaceutical company focused on advanced drug delivery. Mr. Gould began his career at Arthur Andersen, LLP. He currently serves on the board of directors of CytoDyn, Inc., a publicly traded drug development company, and is the Chief Financial Officer, Treasurer and Secretary of Luoxis Diagnostics, Inc. and Vyrix Pharmaceuticals, Inc. Mr. Gould holds a BS in business administration from the University of Colorado and is a certified public accountant."  Upon information and belief, Gould is a citizen of Colorado.

21.    Defendant Mark D. McGregor ("McGregor") has been the Company's Chief Financial Officer from April 2011 until June 10, 2014.  According to the Company's Schedule 14A filed with the SEC on November 1, 2013 (the "2013 Proxy Statement"), " Mr. McGregor is a certified public accountant with over 30 years' financial experience in a variety of industries. Mr. McGregor served in various financial capacities with Louisville, Colorado-based Storage Technology Corporation, or StorageTek, from February 1985 until October 2005. During this period, Mr. McGregor held three positions with StorageTek, including director of revenue management (1985-1987), assistant corporate controller (1987-1993), and vice president, corporate treasurer and corporate development (1993-2005). After leaving StorageTek, Mr. McGregor served as the chief financial officer of

Integrated Management Information, Inc., or IMI, from February 2006 to November 2007. IMI is a publicly-traded provider of identification, verification and communications solutions for the agriculture, livestock, and food industries. He began his career with Price Waterhouse, now PricewaterhouseCoopers LLP, where he spent 13 years with the Audit Department. Mr. McGregor holds a BBA degree in accounting from Texas A&M University and served in the United States Army from 1964 to 1966, where he attained the rank of First Lieutenant."   Upon information and belief, McGregor is a citizen of Colorado.

22.    Defendant Richard B. Giles ("Giles") has been a member of the Company's Board of Directors since August 2010.  Giles is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  According to the Company's 2014 Proxy Statement, "Mr. Giles is the Chief Financial Officer of Ludvik Electric Co., an electrical contractor headquartered in Lakewood, Colorado, a position he has held since 1985. Ludvik Electric is a private electrical contractor with 2013 revenues of over $89 million that has completed electrical contracting projects throughout the United States, South Africa and Germany. As CFO and Treasurer of Ludvik Electric, Mr. Giles oversees accounting, risk management, financial planning and analysis, financial reporting, regulatory compliance, and tax-related accounting functions. He serves also as the trustee of Ludvik Electric Co.'s 401(k) plan. Prior to joining Ludvik Electric, Mr. Giles was for three years an audit partner with Higgins Meritt &

Company, then a Denver, Colorado CPA firm, and during the preceding nine years he was an audit manager and a member of the audit staff of Price Waterhouse, one of the legacy firms which now comprises PricewaterhouseCoopers. While with Price Waterhouse, Mr. Giles participated in a number of public company audits, including one for a leading computer manufacturer.  Mr. Giles received a B.S. degree in accounting from the University of Northern Colorado. He is a member of the American Institute of Certified Public Accountants, Colorado Society of Certified Public Accountants and the Construction Financial Management Association. Mr. Giles' experience in executive financial management, accounting and financial reporting, and corporate accounting and controls led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure."  Upon information and belief, Giles is a citizen of Colorado.

23.    Defendant Philip H. Coelho ("Coelho") has been a member of the Company's Board of Directors since April 2010.  Coelho is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  According to the Company's 2014 Proxy Statement, "Mr. Coelho is the Co-Founder and CTO of SynGen Inc., a firm inventing and commercializing products that harvest stem and progenitor cells derived from a donor or the patient's own body to treat human disease. Prior to founding SynGen Inc. in October 2009, Mr. Coelho was the President and CEO of PHC Medical, Inc., a consulting firm,

from August 2008 through October 2009. From August 2007 through May 2008, Mr. Coelho served as the Chief Technology Architect of ThermoGenesis Corp., a medical products company he founded in 1986 that focused on the regenerative medicine market. From 1989 through July 2007, he was Chairman and Chief Executive Officer of ThermoGenesis Corp. Mr. Coelho served as Vice President of Research & Development of ThermoGenesis from 1986 through 1989. Mr. Coelho has been in the senior management of high technology consumer electronic or medical device companies for over 30 years. He was President of Castleton Inc. from 1982 to 1986, and President of ESS Inc. from 1971 to 1982. Mr. Coelho also serves as a member of the board of directors of Nasdaq-listed company, Catalyst Pharmaceuticals Partners, Inc. (CPRX) (since October 2002), and served as a member of the Board of Directors of NASDAQ-listed Mediware Information Systems, Inc. (MEDW) (from December 2001 until July 2006, and commencing again in May 2008 until it was sold in December 2012). Mr. Coelho received a B.S. degree in thermodynamic and mechanical engineering from the University of California, Davis and has been awarded more than 30 U.S. patents in the areas of cell cryopreservation, cryogenic robotics, cell selection, blood protein harvesting and surgical homeostasis. Mr. Coelho's long tenure as a chief executive officer of a medical device company, as director of a public pharmaceutical company, prior and current public company board experience, and knowledge of corporate finance and governance as an executive and director, as well as his demonstrated success in

developing patented technologies, led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure." Upon information and belief, Coelho is a citizen of California.

24.    Defendant David R. Stevens ("Stevens") has been a member of the Company's Board of Directors since June 2011. Stevens is a member of the Audit Committee and the Compensation Committee. According to the Company's 2014 Proxy Statement, "Dr. Stevens is currently Executive Chairman of Cedus, Inc., a privately-held development stage biopharmaceutical company and a board member of Cetya, Inc., a privately-held development stage pharmaceutical company and of Micro-Imaging Solutions, LLC, a private medical device company. He has served on the boards of several other public and private life science companies, including Poniard Pharmaceuticals, Inc. (2006-2012), Aqua Bounty Technologies, Inc. (2002-2012), and Smart Drug Systems, Inc. (1999-2006), and was an advisor to Bay City Capital from 1999-2006. Dr. Stevens was previously President and CEO of Deprenyl Animal Health, Inc., a public veterinary pharmaceutical company, from 1990 to 1998, and Vice President, Research and Development, of Agrion Corp., a private biotechnology company, from 1986 to 1988. He began his career in pharmaceutical research and development at the former Upjohn Company, where he contributed to the preclinical evaluation of Xanax and Halcion. Dr. Stevens received B.S. and D.V.M. degrees from Washington State University, and a Ph.D. in comparative pathology from the University of California, Davis. He is a

Diplomate of the American College of Veterinary Pathologists. Dr. Stevens has worked in the pharmaceutical and biotechnology industries since 1978. Dr. Stevens' experience in executive management in the pharmaceutical industry, and knowledge of the medical device industry led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure."  Upon information and belief, Stevens is a citizen of Colorado.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.    By reason of their positions as officers, directors and/or fiduciaries of Ampio and because of their ability to control the business and corporate affairs of Ampio, the Individual Defendants owed Ampio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ampio in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Ampio and its shareholders so as to benefit all shareholders equally.

26.    Each director and officer of the Company owes to Ampio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

27.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ampio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28.   To discharge their duties, the officers and directors of Ampio were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

29.   Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ampio, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.   The conduct of the Individual Defendants has been ratified by the Individual Defendants who collectively comprised the Ampio's Board at all relevant times.

30.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty not to

effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information, and had a duty to correct such dissemination of inaccurate and untruthful information.   Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

31.   To discharge their duties, the officers and directors of Ampio were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Ampio were required to, among other things:

(a)   refrain from acting upon material inside corporate information to benefit themselves;

(b)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how Ampio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that Ampio was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

32.     Each of the Individual Defendants further owed to Ampio and the shareholders the duty of loyalty requiring that each favor Ampio's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

33.     Moreover, the Individual Defendants, as either officer, director, and/or employee of the Company, were required to comply with the Company Code of Business Conduct and Ethics ("Code of Ethics").  The Code of Ethics states that it "covers a wide range of business practices and procedures. It does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers and employees of Ampio Pharmaceuticals, Inc. and its subsidiaries... All directors,

officers and employees of Ampio must conduct themselves accordingly and seek to

avoid even the appearance of improper behavior."  The Code of Ethics itself states,

in pertinent part:

> **2. Purpose**
> The Code seeks to deter wrongdoing and to promote:
>
> Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; Full, fair, accurate, timely and understandable disclosure in reports and documents that Ampio files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by Ampio;
>
> Compliance with applicable governmental laws, rules and regulations;
> The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and
>
> Accountability for adherence to the Code.
>
> **3. Compliance with Applicable Laws, Rules and Regulations**
> Obeying the law is the foundation on which Ampio's ethical standards are built. You must comply with applicable laws, rules and regulations. Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or other appropriate personnel.
>  ...
>
> **5. Conflicts of Interest**
> A "conflict of interest" exists when a person's private interests interfere or conflict in any way with the interests of Ampio, or impair, or could be perceived to impair, a person's business judgment.  Decisions should be made strictly on the basis of Ampio's best interests, without regard to personal concerns. You should avoid situations that present potential conflicts of interest, either real or perceived, and should not engage in activities that would make it difficult or appear to make it difficult for you to perform your work objectively and effectively. Examples of when a conflict of interest or potential conflict of interest may arise include, but are not limited to:

When a director, officer or employee takes actions or has interests that may make it difficult to perform his or her work objectively and effectively.

When a director, officer or employee, or a member of his or her family, receives improper personal benefits as a result of his or her position with Ampio.

When an employee works simultaneously for a competitor or, except on our behalf, a customer or supplier. You are not allowed to work for a competitor in any capacity.

When a director, officer or employee serves as a member of the board of directors or advisory board of any company that competes with Ampio.

When a director, officer or employee invests in a customer, supplier, developer or competitor of Ampio. In deciding whether to make such an investment, you should consider the size and nature of the investment, your ability to influence decisions of Ampio or of the other company, your access to confidential information of Ampio or of the other company, and the nature of the relationship between Ampio and the other company.

When a director, officer or employee conducts Ampio business with a relative or significant other, or with a business with which a relative or significant other is associated in any significant role. Relatives include spouse, sister, brother, daughter, son, mother, father, grandparents, aunts, uncles, nieces, nephews, cousins, step relationships and in-laws.  Significant others include persons living in a spousal or familial fashion (including same sex) with an employee, officer or director.

Conflicts of interest should be avoided and in all cases must promptly be disclosed fully to the Chief Executive Officer or the Chair of the Nominating and Governance Committee. In the case of any director, the Chief Executive Officer or any other executive officer, disclosure must be made to the Chairman of the Nominating and Governance Committee. Following such disclosure, the matter shall be considered by the full Board in order to determine what, if any, corrective action is required. In the case of any other employee, disclosure must be made to the Chief Executive Officer or the Outside Counsel. Following such disclosure, the matter shall be considered by the Chief Executive Officer or shall be considered pursuant to guidelines approved by the Chief Executive Officer in order to determine what, if any, corrective action is required. Conflicts of interest may not always be clear-

cut, so if you have a question, you should consult with higher levels of management or Ampio's Chief Executive Officer or Outside Counsel. If you become aware of a conflict or potential conflict, you should bring it to the attention of your supervisor or other appropriate personnel or consult the procedures described in Section 24 of this Code.

**6. Public Disclosure of Information**

The federal securities laws require Ampio to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time, Ampio makes other public communications, such as issuing press releases.

Ampio expects all directors, officers and employees who are involved in the preparation of SEC reports or other public documents to ensure that the information disclosed in those documents is complete, fair, accurate, timely and understandable.

To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to the Chair of Ampio's Audit Committee.

....

**14. Regulatory Requirements**

Ampio follows all applicable laws governing the manufacturing and distribution of drugs, devices or biological products. In particular, we observe all requirements of the U.S. Food and Drug Administration (the "FDA"), and we expect every employee to do likewise at all times. These requirements affect employees who work inside and outside the U.S. alike, as many FDA requirements apply outside of national boundaries. While there are many FDA regulations to consider, regulation of advertising and promotion directly affects our everyday communications. Therefore, all employees are obligated to understand the basic rules with respect to labeling, promotion, off-label use, pharmaceutical samples, and adverse event reporting. As a pharmaceutical company, Ampio is also subject to many healthcare rules and regulations designed to protect the public. As a Ampio employee, you must comply with the laws relating to the conduct of business in the pharmaceutical industry that address:

● fraud and abuse in federal healthcare programs (Medicare and Medicaid);

● improper influence of financial incentives on medical judgment;

● the Pharmaceutical Research and Manufacturers of America voluntary Code on Interactions with Healthcare Professionals ("PhRMA Code"); and

● protect patients and improve the quality of health care services.

....

## 16. Record-Keeping

Ampio requires honest and accurate recording and reporting of information in order to make responsible business decisions and to comply with the law. For example, employees who must report their hours worked should only report the true and actual number of hours worked (whether for purposes of individual pay or for purposes of reporting such information to customers). Ampio also requires each director and employee to disclose any transaction or arrangement among such individual or any family member or affiliated entity of such individual, on the one hand, and any other director, employee or any family member or affiliated entity of such other individual, on the other hand, that in any way relates to or arises out of such individual's professional or working relationship with Ampio.

Many employees regularly use business expense accounts, which must be documented and recorded accurately in accordance with the Company's policies. If you are not sure whether you may seek reimbursement for a certain expense, ask your supervisor or the Chief Financial Officer.

All of Ampio's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect Ampio's transactions and must conform both to applicable legal requirements and to Ampio's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless expressly permitted by applicable law or regulation and the Chief Financial Officer is informed by you in writing of the maintenance of such funds or assets.

Business records and communications (including internal or external e-mails) very often become public, and you should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that can be misunderstood or misconstrued. This policy applies equally to e-mail, internal memos and formal reports. You should always remember that writings or images on your computer screen, screen savers, and pictures or videos you retain or view on your computer screen must

comply with the Company's policies including, without limitation, harassment and discrimination. Records should always be retained or destroyed according to Ampio's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, you must not delete or alter any e-mail that is directly or indirectly related to the subject of the litigation or investigation, or otherwise take any action that could be construed as an effort to obstruct the litigation or investigation. A director or employee who is found to have violated this policy could be subject to criminal penalties, among other things.

**17. Document Retention**
Ampio has records retention and disposal procedures to ensure that Company records are maintained, stored, and, when appropriate, destroyed in accordance with Ampio needs and in compliance with applicable legal, regulatory, environmental, tax, employment and trade requirements. You are expected to be familiar with the specific requirements applicable to your position. Regular document destruction must stop immediately if you are aware of a legal request for such documents or if the Legal Department has issued a document hold notice. If an employee is unsure whether a document has been placed under a legal hold, such employee should preserve and protect that document while the Legal Department is contacted.

34.   At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

35.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.

36.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty

and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, internal controls, and bonuses provided to employees; and (iii) to artificially inflate the Company's stock price.

37.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently to conceal material facts, misrepresent its financial results, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Ampio was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing.

39.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ampio, and was at all times acting within the course and scope of such agency.

## DEFENDANTS' MISCONDUCT

40.     On January 13, 2014, the Company issued a press release announcing that the STEP Study for the treatment for OAK had received IRB approval and FDA IND clearance and that patients enrollment and treatments had commenced.

41.     On February 14, 2014, the Company filed a Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K") with the SEC, which was signed by Defendants Macaluso and McGregor. The 2013 10-K states in part:

> In January 2014, Ampio entered into an agreement with a clinical research organization to conduct its 500 patent Phase III pivotal trial of Ampion for the treatment of osteoarthritis of the knee. The contract fees total $4.7 million and extend over approximately ten months.

42.     On February 18, 2014, the Company issued a press release announcing it has completed enrollment and dosing of 500 patient in the pivotal trial of Ampion for the treatment of OAK.

43.     The statements referenced in paragraphs 40-42 above were materially false and/or misleading and/or failed to disclose that: (1) the clinical research organization conducting the STEP Study lacked autonomy; and (2) the trial drug supply for the STEP Study was shipped to clinical sites at lower temperatures than were permitted by the drug's specifications.

44.     The Company failed to correct the false and/or misleading statements and/or omissions of material fact referenced in paragraphs 40-42.

Verified Shareholder Derivative Complaint

45.     On August 21, 2014, the Company issued a press release announcing a delay in the data analysis of the STEP Study due to the discovery by the independent Clinical Research Organization (CRO) that the study drug, Ampion, and the placebo were, during shipment to the clinical sites, exposed to lower temperatures than permitted by the drug's specifications. The press releases stated in pertinent part:

**Ampio reports that due to temperature deviations below product specifications during shipments to the Ampion™ STEP Study clinical sites, release of data will be delayed**

ENGLEWOOD, CO., August 21, 2014 /PRNewswire/ — Ampio Pharmaceuticals, Inc. (NYSE MKT: AMPE) today announced a delay in the data analysis of the STEP Study due to the discovery by the independent Clinical Research Organization (CRO) that the study drug (both Ampion$^{TM}$ and the placebo) were, during shipment to the clinical sites, exposed to lower temperatures than permitted by the drug specifications

Michael Macaluso, Ampio's CEO, explained "Pivotal clinical trial drug specifications dictate precise temperature and handling conditions for all study drug product in order to assure that the conclusions about the safety and effectiveness of the tested drugs will be accurate and repeatable during routine clinical use.  During the review of all documentation following the unblinding of the Study, our CRO determined that there were multiple instances where the in-package temperature monitor fell significantly below the 15o C minimum required.

Although our entire trial drug supply was housed, packaged, and shipped in early January by a specialized drug shipment vendor contractually obligated to maintain pre-determined temperature requirements under all conditions, our CRO discovered much of the drug product received at the clinical sites had been below the temperature requirement and may have been frozen for some period of time.  The drug temperature specifications were set because Ampion$^{TM}$ may lose potency if it is exposed to temperatures approaching freezing. We have contacted the FDA who has agreed to analyze the STEP trial as supportive data for our BLA."

Mr. Macaluso concluded, "Although we are frustrated by these shipping and receiving deviations of the Step Study protocols, the company is pursuing alternative solutions to meeting the requirements for filing a Biologic License Application (BLA) for Ampion™ on schedule. We are consulting with our regulatory advisors about substituting the data from our Multiple Injection (MI) Study that is currently underway. The compilation of data from the "SPRING" single injection study and the MI study may provide a more comprehensive and clinically meaningful analysis by the FDA reviewers. If the MI study confirms the 85+% reduction in pain reported by the initial patients, it is unlikely that physicians will choose to treat the severe chronic pain experienced by Kellgren Lawrence Grades 3 and 4 OA patients with a single injection. The "Indications for Use" and improved efficacy over placebo, provided by multiple injections, should be of greatest interest to the FDA and the physician community, who are trying to improve the quality of life of their patients."

46.   On August 21, 2014, an article was published on *The Street* by Adam Feuerstein titled "Ampio: The Freezer Killed My Osteoarthritis Drug" that stated that it is incredible for the trial drug to have been shipped at the wrong temperature. The article stated Defendants made this statement after the study was done and after they were aware of its results as an excuse not to share the results with the investing public.

47.   Either the Individual Defendants knew about shipping the drug at the wrong temperature many months before they disclosed it, or they made that up as an excuse to hide from the investing public the poor results of the study.

48.   Furthermore, the statements referenced in paragraph 45 above were materially false and/or misleading and/or failed to disclose that the clinical research organization conducting the STEP Study lacked independence.

49.     The Company failed to correct the false and/or misleading statements and/or omissions of material fact referenced in paragraph 48.

50.     On August 22, 2014, the blog *BuyersStrike* issued a report on Ampio titled "Every Picture Tells a Story -- AMPE, the (other) Dream Team & Raghuram Selvaraju," which asserts a number of red flags with the STEP Study, including that: (1) it was conducted at only one site in Anaheim, California with only one doctor supervising it, which would have been appropriate for the enrollment of only a few patients, yet it enrolled 500 patients; (2) the clinical research organization that conducted the trial -- Dream Team Clinical Research -- has little clinical trial management experience and is located in strip mall by a McDonalds in Anaheim, California; and (3) Dream Team Clinical Research lacks independence as its office is located next door to Dr. Quang D. Vo, the principal investigator of the trial and its door directs all visitors to Dr. Vo's office in the event it is locked.

51.     Significantly, Defendant Macaluso has a history of engaging in what is alleged to be securities fraud.  Macaluso was the CEO of Isolagen, Inc., another biotechnology company, from 2001 to September 2004, a director until April 2005, and a controlling shareholder, owning more than 10% of Isolagen's stock. According to a class action lawsuit in the United States District Court for the Eastern District of Pennsylvania, Macaluso sold Isolagen stock on inside information after he was alleged to have made false and misleading statements of material fact but before the truth was disclosed, garnering proceeds of over $2.5

million.  The motion to dismiss the securities fraud class action complaint made by Macaluso and other Isolagen management was denied by the Court.  The securities fraud action was settled for about $4.5 million.  Isolagen went bankrupt.

## DAMAGES TO AMPIO

52.   As a direct and proximate result of the Individual Defendants' conduct, Ampio has expended and will continue to expend significant sums of money.

53.   Such expenditures include, but are not limited to, legal fees associated with the class action lawsuits filed against the Company and certain Individual Defendants for violations of the federal securities laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations.

54.   Such expenditures include the cost of conducting the STEP Study, as Defendants admitted that the results of the STEP Study were not accurate due to conducting the STEP Study in a faulty manner.

55.   Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

56.   As a direct and proximate result of the Individual Defendants' conduct, Ampio has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the

misrepresentations made by the Individual Defendants and caused to be made by the Company by the Individual Defendants.

## **DERIVATIVE ALLEGATIONS**

57.     Plaintiff brings this action derivatively and for the benefit of Ampio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ampio, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

58.     Ampio is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

59.     Plaintiff is, and at all relevant times has been, an Ampio shareholder. Plaintiff will adequately and fairly represent the interests of Ampio in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

60.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

61.     A pre-suit demand on the Board of Ampio is futile and, therefore, excused.  At the time of filing of this action, the Board consisted of the following five Individual Defendants: Macaluso, Bar-Or, Coelho, Giles, and Stevens

(collectively, the "Directors").  Plaintiff needs only to allege demand futility as to three of the five directors that were on the Board at the time this action was commenced.

62.   Defendant Macaluso acted as the Company's CEO and Chairman, and thus, is a non-independent Director.  Macaluso received from the Company $1.55 million in compensation in 2014, including stock options valued at $1.10 million, and $376,000 thousand in 2013.  Macaluso beneficially owns 4.8%, or 2,549,000 shares, of Company common stock.  As the leader of the Company who was the most responsible for the Company's fraud, and as the maker of the false and misleading statements of material fact as alleged herein, Macaluso breached his fiduciary duties.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Macaluso knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Additionally, Macaluso is a defendant in the federal securities fraud class action lawsuits.  Thus, Macaluso faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

63.   Defendant Bar-Or is the Company's Chief Scientific Officer and a Company Director, and thus, is a non-independent Director.   In 2014 Bar-Or received from the Company $1.84 million in compensation, including stock options valued at $1.54 million. In 2013 Bar-Or received from the Company $924 thousand in compensation, including stock options valued at $469 thousand. Bar-Or

beneficially owns 1.9%, or 1,033,333 shares, of Company common stock.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Bar-Or knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Thus, as a non-independent director, and as an officer who was directly responsible for the Company's fraud, he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

64.    Defendant Giles is a Company Director since August 2010.  Giles is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  Giles received from the Company $400 thousand in compensation in 2014, including stock options valued at $306 thousand.   Giles received from the Company $294 thousand in compensation in 2013, including stock options valued at $210 thousand.  Giles beneficially owns 1.7%, or 880,481 shares, of Company common stock.  In August 2010 Giles loaned the Company $100 thousand.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Giles knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Due to Giles' substantial equity interest in the Company, the substantial income he received from the Company, and the related-party transaction that he engaged in with the Company, Giles is beholden to Macaluso and other Officer Defendants and has a vested interest in causing the Company stock price to be as high as possible.

Thus, as Giles is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

65.    Defendant Coelho is a Company Director since April 2010.  Coelho is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  He received from the Company $241 thousand in compensation in 2014, including stock options valued at $133 thousand. Coelho received from the Company $93 thousand in compensation in 2013.   Coelho beneficially owns 1.1%, or 573,414 shares, of Company common stock.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Coelho knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Due to his substantial equity interest in the Company and his substantial income received from the Company, Coelho is beholden to Macaluso and other Officer Defendants and has a vested interest in causing the Company stock price to be as high as possible. Thus, as Coelho is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

66.    Defendant Stevens is a Company Director since June 2011.  Stevens is a member of the Audit Committee and the Compensation Committee.  He received from the Company $71 thousand in compensation in 2014. Stevens received from

the Company $61 thousand in compensation in 2013.  Stevens beneficially owns 0.4%, or 222,922 shares, of Company common stock.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Stevens knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Due to his substantial equity interest in the Company, Stevens has a vested interest in causing the Company stock price to be as high as possible.  Thus, as Stevens is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

67.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

68.    The Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics is applicable to all employees, including the Company's officers and directors. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Directors to also adhere to Ampio's standards of business conduct.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics by making and/or facilitating the

false misrepresentations set forth, by failing to correct those misrepresentations, and by engaging in misconduct.  Because these Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

69.     Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant Macaluso, who made and/or was responsible for causing the Company's misconduct and for making the false and misleading statements of material fact alleged herein and for failing to correct those false and misleading statements.

70.     Members of the Board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Board from adequately monitoring the Company's operations and calling into question the Individual Defendants' conduct.  Thus, any demand on these Directors would be futile.

71.     Ampio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ampio any part of the damages Ampio suffered

and will continue to suffer thereby.  Thus, any demand on these Directors would be futile.

72.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

73.   The acts complained of herein constitute violations of fiduciary duties owed by Ampio's officers and directors and these acts are incapable of ratification.

74.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ampio.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Ampio, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

75.    If there is no directors' and officers' liability insurance, then the Directors will not cause Ampio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

76.    Thus, for the reasons set forth above, all of the Directors, and, if not all of them, certainly a majority of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

77.    Overall, the Company will most likely expend millions of dollars in internal investigations and defending the securities fraud class actions.  It may be liable for millions of dollars in damages if it loses or settles the related securities fraud class actions.   Moreover, the Company's reputation has been severely damaged.   The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers.   Its market

capitalization has been severely diminished and its prospect of raising equity in the future is questionable.  All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

78.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

79.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ampio's business and affairs.

80.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

81.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Ampio.

82.    In breach of their fiduciary duties owed to Ampio, the Individual willfully engaged in misconduct and participated in misrepresentation of the Company's business operations and prospects and failed to correct the Company's

public statements, rendering them personally liable to the Company for breaching their fiduciary duties.

83.    The Individual Defendants had actual or constructive knowledge that they had engaged in misconduct and caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such material misrepresentations and omissions were made, and were subsequently not corrected, knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ampio's securities.

84.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

85.    Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, and failed to correct such misrepresentations and omissions.    Such material misrepresentations and/or omissions were caused to be made knowingly or recklessly.    Such failure to correct the material

misrepresentations and/or omissions was caused to be done knowingly or recklessly.

86.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ampio has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

### SECOND CLAIM

**Against Individual Defendants for Abuse of Control**

87.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

88.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ampio, for which they are legally responsible.

89.     As a direct and proximate result of the Individual Defendants' abuse of control, Ampio has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Ampio has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### THIRD CLAIM

**Against Individual Defendants for Gross Mismanagement**

90.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

91.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ampio in a manner consistent with the operations of a publicly-held corporation.

92.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ampio has sustained and will continue to sustain significant damages.

93.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

94.    Plaintiff, on behalf of Ampio, has no adequate remedy at law.

## **FOURTH CLAIM**

### **Against Individual Defendants for Unjust Enrichment**

95.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

96.    By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ampio.

97.     The Individual Defendants either received bonuses, stock options, or similar compensation from Ampio that was tied to the financial performance or artificially inflated valuation of Ampio or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

98.     Plaintiff, as a shareholder and a representative of Ampio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ampio, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ampio;

(c)     Determining and awarding to Ampio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Ampio and the Individual Defendants to take all

necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ampio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Ampio to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Ampio restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other an1d further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 3, 2015                    Respectfully submitted,

                                         Timothy W. Brown
                                         THE BROWN LAW FIRM, P.C.

                                                    *-and-*

                                         Robert C. Moest
                                         LAW OFFICES OF ROBERT C. MOEST

                                         By: _____/s Robert C. Moest_____

                                         *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Michele Oglina, am the plaintiff in the within action and am a citizen of Italy. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __3ʳᵈ__ day of __August__ 2015.

_____
Michele Oglina